STEPHEN W. STEELMAN (CSBN 196147)
*LAW OFFICE OF STEPHEN W. STEELMAN*
22 Battery Street, Suite 333
San Francisco, CA 94111
Tel.   (415) 593-3777
Fax   (415) 593-3778

Attorney for Plaintiff
ALEXANDER P. SOMMER

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

-oo0oo-

| | |
|---|---|
| ALEXANDER P. SOMMER, an individual<br><br>         Plaintiff,<br><br>     v.<br><br>UNUM, UNUM PROVIDENT CORPORATION;<br>UNUM PROVIDENT LIFE INSURANCE<br>COMPANY OF AMERICA; FIRST UNUM<br>LIFE INSURANCE COMPANY OF AMERICA;<br>PAUL REVERE LIFE<br>INSURANCE COMPANY;<br>UNITED STATES LIFE INSURANCE<br>COMPANY,<br>         AND DOES 1-300,<br><br>         Defendants. | CASE NO.  C-07-2864 SC<br><br>PLAINTIFF ALEXANDER P.<br>SOMMER'S MEMORANDUM OF<br>POINTS AND AUTHORITIES IN<br>OPPOSITION TO DEFENDANTS'<br>MOTION TO DISMISS<br><br>SUBMITTED,<br>BY ORDER OF THE COURT,<br>WITHOUT ORAL ARGUMENT |

Opposition to Motion to Strike: *Sommer* v. *UNUM*

# TABLE OF AUTHORITIES

*To Plaintiff's Opposition to Dependants' Motion to Dismiss*

**CASES**                                                                 Page

*Robi* v. *Five Platters, Inc.,* 838 F.2d 318, 324 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11

*McHugh* v. *Howard,* 165 Cal.App.2d 169, (1958 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*McCarty* v. *First of Georgia Ins. Co.,* (713 F.2d 609, C.A.Okl.(1983) . . . . . . . . . . . . . . . . . . 6,7

*Costantini* v. *Trans World Airlines,* 681 F.2d 1199, C.A.Cal., (1982) . . . . . . . . . . . . . . . . . . . . 7

*Bolte* v. *Aits, Inc.,* 60 Haw. 58, (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8

*Jenkins* v. *County of Riverside,* 138 Cal.App.4th 593(2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Robert J.* v. *Leslie M.* 51 Cal.App.4th 16421(997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**STATUTES**

*29 USC §1144 et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*29 USC §1001* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*18 USC §1961* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*18 USC §1341* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13, 14*

*29 USC 1132 (a)(1)(B)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*

*18 USC § 1964 (c)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*FRCP RULE 11* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15, 16, 17*


**SECONDARY SOURCES**

Richard Wm. Zevnik: *The Complete Book of Insurance*, p.3, Sphinx Publishing, Naperville, IL., 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

# I
# INTRODUCTION

A well regulated and honest insurance industry is an essential part of our economic system.

> Insurance plays a broad role in the worldwide economy, helping to assure that millions of transactions and other activities, economic and non economic, can take place.
>
> Without insurance, local state, national and international business would quickly grind to a halt. Lenders would cease lending for purchases of land, buildings, homes vehicles or equipment/ Without premises liability insurance, a simple slip and fall claim could put a small business owner out of business.
>
> (Richard Wm. Zevnik: *The Complete Book of Insurance*, p.3, Sphinx Publishing, Naperville, IL., 2004)

There is a colorable argument to be made that, without insurance to cover the risk involved the United States of America might not exist.

> Frankly, the United States as an indirect product of the initial commercial-empire building activities of Great Britain, owes its existence to the business of insurance in large part. Great Britain became a major commercial power in the 17th century, based on risks taken by companies established to capitalize on the demand for spices, tea sugar dyes, fabrics, and other desired commodities.
>
> (Op. Cit. at p. 4)

In his retirement speech, James Kemper, Jr., the president of Kemper Insurance Company offered the following trenchant analysis of this same proposition.

> England in the 17th century was still a largely agricultural society in which everything was dependant on the ownership of land. Those who owned the land also owned everything else. The entrepreneurs who hoped to send sailing vessels around the world looking for tea and cotton needed investors to pay for the ships and crews. Such investors were, often, land holders who were being asked to mortgage their land, that is, to risk everything, on what was, at best, a very shaky proposition - a 17th century sailing vessel setting off onto the high seas with poor navigational ability and no means of communication, destined to make land fall in uncharted harbors and among unknown people. If, as was often the case, the ship did not return, the investors money, and perhaps his land, were lost.
>
> No reasonable man would take such a risk - unless it was insured. The business of insurance allowed, and even encouraged men to take the risks that moved civilization forward.[1]

A properly functioning insurance industry is essential to the smooth functioning of our

---

[1] Unfortunately, this is but a paraphrase of this very enlightening speech, which plaintiff's counsel, an addictive reader, read as an undergraduate some thirty years ago. The speech, not being found after several hours of research, the proffered 'Quotation' is accurate within the limits imposed by memory and, plaintiff asserts, properly sets forth the important place of insurance in our society.

Opposition to Motion to Strike: *Sommer* v. *UNUM*                                                                       - 1 -

1 entire socio-economic system.

2     The defendants herein comprise the largest disability insurer in the United States.

3 According the official UNUM "Investor Relations" web page:

> Through its insurance subsidiaries, Unum is the industry leader[1] in group and individual income protection and related coverages and services, insuring more than 25 million people. Unum offers a comprehensive, integrated portfolio of products and services backed by industry-leading return-to-work resources and disability expertise. Headquartered in Chattanooga, Tennessee, Unum has significant U.S. operations in Portland, Maine, Worcester, Massachusetts, Glendale, California and Columbia, South Carolina (Colonial Life & Accident Insurance Company) and in the United Kingdom, Dorking, England. The Company employs more than 10,000 people worldwide.
>
> In 2006, Unum reported revenue of more than $10.5 billion which included $7.95 billion in premium income. Total assets on December 31, 2006 totaled $52.8 billion and shareholder equity stood at $7.7 billion.
>
> (1)
> Unum represents the multiple insuring subsidiaries of Unum Corporation, including the #1 group and individual income protection carriers in the United States, according to the JHA 2006 U.S. Group and Individual Disability Market Surveys, 2006.
>
> (Please see **EXHIBIT "A"** to the declaration of Stephen W. Steelman in Opposition to Defendants' Motion to Dismiss (hereinafter "SSDEC") filed and served concurrently herewith)

It is, accordingly, a matter of vital public interest, whether this important company, dominating, as it does, a significant aspect of the American economy, is abiding by the laws of the nation, the several states in which it sells policies, and the regulations of the various regulatory bodies charged with overseeing its practices.

    Sadly, defendants herein have a national and international reputation as bad actors in the insurance industry, to wit:

- On January 10, 2003, the Financial Services Agency of the nation of Japan, ordered UNUM Japan Accident Insurance Company, a wholey owned subsidiary of UNUM Group, to suspend operations for one month, the longest suspension of an insurer ever ordered by that agency. The FSA ordered the suspension after it was discovered that UNUM Japan falsified board meeting minuets and committed other legal violations; (SSDec. **EXHIBIT "B"**)

- On November 18 2004 the Tennessee Department of Commerce announces that all fifty states and the District of Columbia have joined in an "examination of the claim handling practices of "three disability insurers owned by UNUM/Provident Corp., which plaintiff is informed and believes and based thereon alleges was the predecessor in interest to defendant herein UNUM Group. (SSDec. **EXHIBIT "C"**)

- On December 21, 2003, the Tennessee Department of Commerce announced that forty states had agreed to the terms of a settlement agreement between the federal government and the insurance regulatory bodies of forty-nine states, on the one hand and UNUM

- Group on the other. As a result of such settlement, UNUM agreed to pay Fifteen Million Dollars ($15,000,000.00) in fines; (SSDec. **EXHIBIT "D"**)

- On November 18, 2004, The Associated Press Reported that, as a result of action by then New York Attorney General Elliott Spitzer, UNUM was ro pay Fifteen Million Dollars ($15,000,000.00) in fines and re-open and reassess some Two Hundred Thousand (200,000) claims; (SSDec. **EXHIBIT "E"**)

- On October 3, 2005, after a two year investigation, California State Insurance Commissioner John Garamendi announced that UNUM would pay an Eight Million Dollar ($8,000,000.00) fine and reopen and reassess Twenty-six Thousand (26,000) claims. The investigation uncovered more than 25 business practices that the Department of Insurance said violated California law, including:

- -- Knowingly applying the wrong definition of "total disability" in claims handling;

- -- Selectively and inappropriately using independent medical exams and other medical information to the company's own advantage;

- -- Mischaracterizing certain non-sedentary nursing occupations as sedentary, which required policyholders to find sedentary nursing work instead of receiving the disability benefits to which they were entitled and thereby,

- Repeatedly violating California Insurance Cod Sections 700 and 704. (SSDec. **EXHIBIT "F"**)

As a result of the settlement, the Department of Insurance said that the following could occur:

- -- California claimants who opted in under the multistate settlement will be reassessed under California settlement standards;

- -- A higher standard must be met for the insurer to reject a claimant's doctor's opinion on disability, and the reasons must be documented in claim files;

- -- Claimants or their doctors may request an independent medical examination;

- -- All other claims handling changes implemented in the multistate settlement are incorporated within the California settlement.

The terms of this settlement agreement applied to California claimants who were denied benefits between Jan. 1, 1997 and Sept. 30, 2005. (SSDec. **EXHIBIT "G"**)

## II
## FACTUAL BACKGROUND

Plaintiff Alexander Sommer spent his professional life as a stockbroker. By the age of fifty-one he was a partner and vice president in a major stockbrokerage firm. Alex had, and continues to have, a reputation for hard work, diligence and honesty. Nor is he the sort of person to attempt to abuse the legal system. Before suffering the injuries underlying this lawsuit Alex had never been involved in a lawsuit, as a plaintiff or defendant, whether business related or personal, in his entire life.

Opposition to Motion to Strike: *Sommer* v. *UNUM*                                                                                     - 3 -

1   In late November 1988, Alex was diagnosed with a severe malformation of the blood vessels in his brain. During December of 1988, Alex underwent three separate brain surgeries: one in preparation for repair of the arterial/venous malformation; one to repair the malformation itself; and one as a result of a rare but virulent infection of the brain he suffered as a result of the surgery. Between the three surgeries Alex underwent over twenty-four hours of brain surgery.

Subsequent radiological studies reveal that, as a result of the surgeries and infection, a portion of Alex's brain, approximately the size of a ping-pong ball, is dead. This dead patch in Alex's Brain in located in the area of the brain having to do with higher cognitive function, and especially what are referred to, in the field of brain function analysis, as "administrative functions."

Alex has undergone a series of brain function tests. These tests reveal that Alex has suffered significant injury to his brain's administrative function capacity. Such injuries have resulted in neuro-psychiatric deficits in the following areas:

A. Impulsivity, with an inability to see the consequences of his actions;
B. Significant decline in his ability to retrieve information from memory after long delay;
C. Weakness in the ability to store information requiring associative verbal skills;
D. Verbal learning;
E. Reasoning efficiency;
F. Short term recall;
G. Delayed recall;
H. Sustained auditory attention;
I. Higher level set shifting and inhibition;
J. Generation of strategies for problem solving;
K. Affective control with respect to irritability and; *especially,* with sustained attention and memory.

In fact, as a direct and proximate result of the above noted injuries and disabilities, plaintiff is now, and has been since a date uncertain, before his first surgery in December of 1988, incompetent to work as a stockbroker or to manage his own legal affairs.

At the time of his injuries, as befits a man of conservative disposition, Alex was well insured. In fact, over the course of his career, Alex had purchased several disability insurance policies the monthly benefits of which totaled more than $11,000.00 per month. The Insurers who insured Alex included these present defendants.

Alex had purchased insurance policies both as an individual and through his employer. All of the insurers, except one, denied Alex's claim for disability benefits. As this court is aware,

Opposition to Motion to Strike: *Sommer* v. *UNUM*                                                          - 4 -

when a person purchases a disability insurance policy as an individual, and should the insurer thereafter wrongfully deny him insurance benefits, that person may recover damages in tort. However, if that same person purchases an insurance policy through his employer, even though he pays all the premiums himself, if the insurer later wrongfully denies him his insurance benefits, he can recover only contract damages.

This is significant in the present matter because Alex was insured under both sorts of policies, both privately purchased and purchased through his employer. Significantly, the only insurer who paid Alex on his disability claim was the one who faced liability for a possible tort damages award if it were found liable for wrongful denial of insurance benefits. It is noteworthy that that company was wholey owned by UNUM but that UNUM itself, with whom Alex had a separate policy purchased through his employer, did not pay Alex at all because, had they been found liable for wrongful denial of benefits they would only have had to pay Alex his contract benefits, that is, what they should have paid him in the first place.

Because Alex's insurers did not pay him the benefits for which he had paid premiums for years, Alex lost his home. Moreover, the precipitous and persistent financial difficulties he suffered as a result of such denials of benefits destroyed his marriage of over twenty years and, because he was broke, he was unable to procure adequate healthcare for his daughter who suffers from a severe chronic illness and whose life, as a direct result of the only intermittent and less than excellent health care she has received, has been much more difficult and unhappy than it otherwise would have been.

The actions of the defendants in this case have financially ruined Alex Sommer and torn his family apart.

## II
## LEGAL ARGUMENT

The application of Res Judicata in California focuses on three questions:

(1) was the previous adjudication on the merits,

(2) was it final, and

(3) does the current dispute involve the same 'claim' or 'cause of action'?

(*Robi v. Five Platters, Inc.*, 838 F.2d 318, 324 (9th Cir.1988),

Opposition to Motion to Strike: *Sommer* v. *UNUM*                                         - 5 -

Based on the allegations in the Complaint currently before this court, the law mandates two exceptions to what might otherwise be a valid claim of Res Judicata:

A. Where the underlying judgment was obtained by fraud, such judgment will not act as a Res Judicata bar to a subsequent claim;

B. Where there is a strong public policy reason for allowing the case to go forward the doctrine of Res Judicata will not be permitted to bar an action.

Additionally, plaintiff asserts that Res Judicata can not be applied to bar the present action because plaintiff in this action seeks the vindication of different rights than in any pervious actions.

A.   A Judgment Obtained by Fraud Will Not Act as a Res Judicata Bar

It is a well established rule of law that where a prior judgment against one party by another is obtained by fraud, that judgment can not be relied upon to provide a Res Judicata bar to a subsequent suit between the parties. This principle is recognized by both our state and Federal Courts

> If a judgment is obtained by means of extrinsic fraud, or if the jurisdiction of the court was imposed upon, it is not entitled to the protection afforded by this doctrine [Res Judicata] and equitable relief [from the Res Judicata bar] will be allowed.

(*McHugh* v. *Howard*, 165 Cal.App.2d 169, (1958)

The case of *McCarty* v. *First of Georgia Ins. Co.*, (713 F.2d 609, C.A.Okl.(1983)), is illustrative. In *McCarty*, as in earlier Sommer cases, the plaintiff brought an action on an insurance contract. The insurer denied that it had ever issued the policy, and won on a limitations defense. In litigation with the agent who had issued the policy, the plaintiff's discovered the fact that the insurer *had* issued and approved the policy. Thereafter, a second action against the insurer for the tort of failing to deal fairly was not barred by Res Judicata. The court reasoned that the doctrine of Res Judicata, "serves no purpose if a plaintiff can not reasonably be expected to include all claims in the first action." The *McCarty* court held that the company's wrongful concealment of the facts had prevented the plaintiffs, who believed that the company was taking its position in good faith, from knowing they had a tort claim. (*McCarty*, (*supra*) at 612-613)

The facts and law underlying the present case are analogous. In the past Plaintiff brought a lawsuit against his insurers for wrongful denial of ERISA benefits. The insurers denied that

Opposition to Motion to Strike: *Sommer* v. *UNUM*                                      - 6 -

plaintiff was entitled to the benefits under the policies. In a subsequent action against the insurers by the California Department of Insurance, it was discovered that the insurers had so arranged their several enterprises that they could collect premiums but could, at their sole descrition, wrongfully refuse to pay benefits to claimants with large benefit packages such as present plaintiff.

Also as in *McCarty*, these defendants seek to bar a new suit, based on the Insurance Commissioner's discoveries, by asserting a Res Judicata defense. The law will not allow itself to be so abused.

As the *McCarty* court said:

> Res judicata does not shield a blameworthy defendant from the consequences of his own misconduct. The rule against splitting causes of action serves no purpose if a plaintiff cannot reasonably be expected to include all claims in the first action. As the court reasoned in *American Home*, "where plaintiff's omission of an item of his cause of action was brought about by defendant's fraud, deception, or wrongful conduct, the former judgment has been held not to be a bar to suit." 577 P.2d at 905; see Restatement (Second) of Judgments § 26 comment j (1982).

(*Ibid*)

Our local Federal Court of Appeals also recognizes the fraud exception to the Res Judicata bar.

In *Costantini* v. *Trans World Airlines*, 681 F.2d 1199, C.A.Cal., (1982), the Ninth Circuit Court of Appeals, although declining to recognize the fraud exception under the Complaint it was then considering, *did explicitly recognize* the validity of the fraud exception to the doctrine of Res Judicata.

> The cases in which the fraud exception to res judicata was applied differ crucially from the instant case in that they involve situations where defendant's misconduct **prevented plaintiff from knowing, at the time of the first suit, either that he had a certain claim or else the extent of his injury**. See, e.g., *Christian* v. *American Home Assurance Co.*, 577 P.2d 899 (Okl.1978) (plaintiff discovered cause of action for bad-faith refusal to satisfy his claim only when breach-of-contract case went to jury); *United States Rubber Co.* v. *Lucky Nine, Inc.*, 159 So.2d 874 (Fla.App.1964) (defendant's deceitful testimony at the first trial concealed from plaintiff the true amount it was owed); *Hyyti* v. *Smith*, 67 N.D. 425, 272 N.W. 747 (1937) (deception by an attorney connected with defendant's law firm kept plaintiff from learning that she could seek compensation for loss of support as well as out-of-pocket expenses in her wrongful death action).

(*Costantini*, (*supra*) at 1202 fn 12) (Emphasis added.)

In fact, recognition of the fraud exception is the majority rule throughout the United States.

> We adhere to the rule adopted by the majority of jurisdictions that have dealt with the problem that a former recovery will not bar claims of which the plaintiff was

Opposition to Motion to Strike: *Sommer v. UNUM*                                          - 7 -

> ignorant, **814 even if those claims existed at the time suit was commenced in the former recovery and could have been joined, unless plaintiff's ignorance was due to his own negligence. The rule is also applicable if plaintiff's ignorance was due to the fault or fraud of an adverse party. 50 C.J.S. Judgments s 667. See also *In re 431 Oakdale Avenue Bldg. Corp.*, 28 F.Supp. 63 (1939); *McVay* v. *Castenara,* 152 Miss. 106, 119 So. 155 (1928); *Holland* v. *Spear & Co.*, 193 Misc. 524, 83 N.Y.S.2d 21 (1948); *Hyyti* v. *Smith*, 67 N.D. 425, 272 N.W. 747 (1937); *Badger* v. *Badger*, 69 Utah 293, 254 P. 784 (1927).

(*Bolte* v. *Aits, Inc.*, 60 Haw. 58, (1975))

In the instant case, the findings of the Insurance Commissioner of the State of California, as set forth in the Complaint on file herein, include findings that these present defendants did, as a regular part of the course of their business:

1. Knowingly apply a definition of "disability" in claims handling in a manner inconsistent with the definition of "total disability" set forth in California case law;

2. Mischaracterize the claimant's occupation and/or its duties in determining whether the claimant was disabled from performing with reasonable continuity the substantial and material duties of his or her own occupation;

3. Selectively use independent medical examinations to UNUM's own advantage;

4. Overrule the opinion of the attending physician after UNUM's in-house medical personnel conducted a merely "paper review" of the [claimant's] medical file. [and that]

5. Each such act was in violation of California Insurance Code §§ 700 and 704.

In fact, as the Complaint alleges:

> defendants did not intend to insure plaintiff, but rather had so structured, organized and did maintain their respective businesses that defendants UNUM were not legitimate insurance companies at all, but were, rather, a racket a corrupt sham company, an enterprise organized for the purpose of collecting premiums but not paying valid claims.
>
> (Complaint ¶ 41)

The Complaint herein offers a clear indication that these present defendants created a system of claims handling *the primary function of which was to allow them to avoid paying legitimate claims for benefits*.

Further, given these defendants' long, and very public, history of defrauding their own insureds as well as the regulatory agencies charged with their oversight, plaintiff is confident that, if he is permitted to perform discovery, the evidence will show that UNUM never told the any court that it engaged in the behavior set forth in the insurance commissioner's findings but that, on the contrary, UNUM presented to the court and otherwise offered into evidence, documents, such as copies of the insurance policies under which plaintiff claimed coverage in full knowledge that

Opposition to Motion to Strike: *Sommer v. UNUM* — 8 —